J-S33001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 674 MDA 2024 |

Appeal from the Decree Entered April 18, 2024
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  070-ADOPT-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 675 MDA 2024 |

Appeal from the Decree Entered April 18, 2024
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  071-ADPT-2023

BEFORE:  OLSON, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY OLSON, J.:                **FILED: OCTOBER 16, 2024**

B.C. ("Father") appeals from the April 18, 2024 decrees that involuntarily terminated his parental rights to his son, N.C., born in April 2018,

and his daughter, T.C., born in February 2023 (collectively, the "Children").[1,2] Upon review, we affirm.

We glean the relevant factual and procedural history from the certified record. Cumberland County Children and Youth Services ("CYS" or "the Agency") first became aware of this family in July 2022, when Mother was hospitalized for heroin use and withdrawal. That same month, Father pleaded guilty to simple assault, false imprisonment, and theft. Father was sentenced to a term of incarceration of two-and one-half years to five years, and he has been incarcerated at all times relevant to this appeal.

Following Mother's violation of a safety plan involving N.C., the juvenile court placed him in the Agency's emergency custody on October 18, 2022. Ultimately, following a hearing, the court adjudicated N.C. dependent on November 17, 2022, and established reunification as his permanency goal with the concurrent goal of adoption.

_____

[1] The April 18, 2024 decree involuntarily terminating Father's parental rights to T.C. mistakenly referred to N.C. On May 31, 2024, this Court ordered the orphans' court to enter an amended decree correcting the name of the child in the body of the decree, and the court did so on June 7, 2024. Thereafter, Father filed a timely amended notice of appeal at docket number 675 MDA 2024.

[2] On the same date, by separate decrees, the court also terminated the parental rights of the Children's Mother, B.D. ("Mother") (collectively with Father, "Parents"). Mother did not file separate notices of appeal or participate in the instant appeal.

Following his initial placement in October 2022, N.C.'s foster family reported concerns to the Agency regarding his ability to self-regulate. Therefore, his primary care provider referred him to a developmental pediatrician who determined that he may suffer from attention deficit disorder. N.C. also has an individualized education plan at school where he receives small group instruction and speech therapy. Further, according to Bair Foundation foster care specialist, Ginger Kunkel, N.C. would begin "trauma therapy" in April 2024 to aid in his self-regulation skills.

In February 2023, Mother gave birth to T.C., who was born addicted to opioids. On February 22, 2023, the court placed T.C. in the Agency's protective custody. From birth until May 12, 2023, T.C. remained hospitalized due to drug withdrawal and a myriad of medical issues detailed below. During that time, she was transferred between three different hospitals for inpatient care. Prior to T.C.'s ultimate discharge from the hospital, on April 24, 2023, the juvenile court adjudicated her dependent and established a permanency goal of reunification.

T.C. suffers from brain damage and is "universally delayed." N.T., 4/17/2024, at 62-63, 130. Despite being fourteen months old at the time of the termination hearing, she was only the size of a seven-month-old child. She also has small holes in her heart, acid reflux, difficulty relaxing her shoulders and arms, and requires a gastronomy tube ("G-Tube") to eat. To address her medical conditions, T.C. is actively in treatment with a

cardiologist, gastroenterologist, neurologist, and endocrinologist. Additionally, according to Ms. Kunkel, T.C. would begin seeing an audiologist and ophthalmologist in the weeks following the termination hearing. T.C. resides in a pre-adoptive foster home placement capable of meeting her medical needs, and N.C. was transferred to the same placement in July 2023.

In furtherance of the Children's goals of reunification, Father was required to (1) complete a drug and alcohol outpatient program; (2) complete a violence prevention program; (3) complete a parenting program; (4) attend visitation with the Children; and (5) cooperate with CYS. *See* N.T., 4/17/2024, at 101-102; *see also* CYS Exhibit 4 and 5.

According to CYS caseworker, Sandra Gibson, Father completed a drug and alcohol program in September 2023, while incarcerated. *See* N.T., 4/17/2024, at 101. Additionally, CYS confirmed that he is on a prison waiting list to attend a violence prevention program. Further, Father has participated in supervised visitation with the Children five times and all but one of them was virtual. Father also briefly attended a boot camp in an attempt to achieve parole earlier, however, he was removed from the camp after approximately three weeks, and he was denied readmission.

On March 5, 2024, CYS filed petitions seeking the involuntary termination of Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court conducted an evidentiary hearing on April 17, 2024. In compliance with Section 2313(a) of

the Adoption Act, the court appointed Cindy Martin, Esquire, as legal counsel for the Children and separately appointed Tammi B. Blackburn, Esquire, as their guardian *ad litem* ("GAL").[3] **See generally In re Adoption of K.M.G.**, 240 A.3d 1218, 1234-36 (Pa. 2020).

CYS presented the testimony of Mother's probation officer, Haley McCastle; Alternative Behavior Consultants ("ABC") visitation supervisor, Linda Mapes; Bair Foundation permanency specialist, Elizabeth Kemrer; Ms. Kunkel; Ms. Gibson; and foster mother, E.N.[4] Father testified on his own behalf.

By decrees dated April 17, 2024, and entered on April 18, 2024, the orphans' court involuntarily terminated Father's parental rights to the Children. Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On June 11, 2024, the orphans' court filed a singular Rule 1925(a) opinion analyzing Father's arguments regarding the Children.[5] This Court consolidated Father's appeals *sua sponte* on June 26, 2024.

---

[3] Neither the Children's GAL, nor their legal counsel, filed a brief concerning the instant appeal. However, at the conclusion of the April 17, 2024, termination hearing, both supported the involuntary termination of Father's parental rights. **See** N.T., 4/17/2024, at 205-210.

[4] CYS also introduced, and the orphans' court admitted, various exhibits.

[5] In its opinion, the orphans' court contends that it did not err in terminating Father's parental rights pursuant to Section 2511(a)(5) and (8). However,
*(Footnote Continued Next Page)*

On appeal, Father presents the following issues for review:

1. Whether the orphans' court erred as a matter of law and abused its discretion when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of Father's parental rights to his Children, thus contravening Section 2511(a) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)?

2. Whether the orphans' court erred as a matter of law and abused its discretion in terminating Father's parental rights without adequately considering Father's incarceration and his limited ability to work on his permanency plan goals and objectives, thus contravening Sections 2511(a) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a) and (b)?

3. Whether the orphans' court erred as a matter of law and abused its discretion in determining the best interests of the Children would be served by terminating a loving parent's parental rights when Father, if given sufficient time, would be ready, willing, and able to parent the Children and provide for their needs, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 4 (cleaned up).

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an

---

because Father was incarcerated when the Children were removed, Section 2511(a)(5) and (8) are not applicable. **See In re C.S.**, 761 A.2d 1197, 1200 (Pa. Super. 2000) (determining that because the father was incarcerated "[t]ermination under subsection 2511(a)(5) [and (8)] was not appropriate here because the record reflects that [the child] was never in [the a]ppellant's care and, therefore, could not have been removed from his care.").

appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs

and welfare.  ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).  This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination.  ***See M.E.***, 283 A.3d at 830 (citing ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case will focus upon Section 2511(a)(2) and (b), which provides, as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).[6]

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)).

Of particular note to the instant appeal, while a parent's incarceration is not automatically dispositive with respect to termination, it is a relevant and potentially determinative factor to consider pursuant to Section 2511(a)(2):

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to [Section] 2511(a)(2).

---

[6] Based on our disposition, we need not analyze Father's arguments regarding Section 2511(a)(1), (5), and (8).

*In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012). Overall, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court must then turn to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

The Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.* at 1109. The Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (cleaned up). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (cleaned up).

In considering the affection which a child may have for his or her natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." **M.E.**, 283 A.3d at 839 (cleaned up). We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. **Id.**

In his first and second issues, Father argues that the court abused its discretion in terminating his parental rights solely on the basis of his incarceration. Specifically, he asserts that CYS failed to provide reasonable efforts to reunify the Children with him by not allowing him more visits and consistent contact with the Children. He further argues that, despite CYS's lack of reasonable efforts, he has attempted to overcome his perceived incapacity, *i.e.*, incarceration, by trying to stay in contact with the Children, the foster parents, and the Agency. He further contends that the orphans' court overemphasized his incarceration when discussing Section 2511(a)(2). Father asserts that he will be released from prison on his minimum sentence date in February 2025, thus resolving his incapacity. He states that he just needs more time. Accordingly, he concludes that the orphans' court erred in finding that Father cannot or will not remedy his incapacity.

In finding that CYS met its burden for involuntarily terminating Father's parental rights to the Children, then six and one year olds, respectively, the orphans' court stated the following:

In the underlying matter, Father was incarcerated prior to N.C.'s adjudication of dependency, was incarcerated at the time of T.C.'s

- 12 -

birth and has never met T.C. in person. Father's earliest release date is February 2025, approximately ten months after the April 17, 2024, termination hearing, and [26] months from the date of N.C.'s placement. During his period of incarceration[,] Father has been unable to provide either child with essential care, control, or subsistence.

Even if Father is released in February 2025, no evidence was presented that Father would immediately be capable of providing for the [C]hildren. To the contrary, Father testified that it would take him about a year to position himself where he could provide the [C]hildren with essential care, control, or subsistence. [**See** N.T., 4/17/2024, at 185-186]. Among other things, Father would still need to obtain housing and employment and fulfill any responsibility outlined by his parole guidelines[. Regarding T.C.,] Father will have to learn to take care of a child whom he does not know and who has elevated medical and special needs[.]

Father's incarceration has left him largely incapable of providing for [the Children] with essential care, control, and subsistence necessary for their physical and mental well-being. Even if Father is released on parole in February 2025, he still has additional hurdles that he must overcome before he may be able to provide for the [C]hildren[.] As such, CYS presented clear and convincing evidence supporting grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2).

Orphans' Court Opinion, 6/11/2024, at 10-11. We agree.

Initially, regarding Father's argument that CYS failed to make reasonable efforts towards reunification, his argument fails pursuant to **In the Interest of D.C.D.**, 105 A.3d 662 (Pa. 2014), wherein our Supreme Court held that, with respect to Section 2511 of the Adoption Act, "Neither subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." **Id.** at 672.

In this case, Father's confinement, which has spanned the entirety of the Children's dependencies, prevented him from providing the Children with

- 13 -

essential parental care, control, and subsistence necessary for their well-being. As he testified to, he has only been able to participate in five supervised visitations, and he has never met T.C. in person. *See* N.T., 4/17/2024, at 140-143, 169. The Children's foster mother reported that during the three visits she supervised, Father often attempted to talk about why N.C. was calling foster parents "mom and dad," instead of focusing on connecting with his son. *Id.* at 161-162. Finally, the foster mother testified extensively regarding the needs of T.C. and that when she attempted to show Father how to use the G-Tube, he did not want to learn because he stated it would "turn [his] stomach." *Id.* at 163.

Further, the orphans' court appropriately considered his incarceration when conducting its analysis under Section 2511(a)(2). As accurately stated by the court, Father's earliest release date is February 2025, and his maximum release date is August 2027. *See* N.T., 4/17/2024, at 167; *see also* CYS Exhibit 20. Father testified that, if released on parole, it would take approximately one year before he would be capable of caring for the Children. *See* N.T., 4/17/2024, at 185. Thus, even assuming that Father is released from prison at the earliest possible date, Father would not be in a position to care for the Children until February 2026. Accordingly, the orphans' court did not err in considering the remaining length of Father's sentence. *See S.P.*, 47 A.3d at 830. ("[T]he length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the

incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to [Section] 2511(a)(2).").  Other than bald assertions made by Father, there is no evidence in the certified record that he will be able to remedy his incapacity and provide essential care for the Children, especially T.C. who has significant medical needs.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights pursuant to Section 2511(a)(2).  The record demonstrates that Father's incarceration prevented him from providing essential parental care, control, or subsistence necessary for the Children's physical and mental well-being, and that the causes of his incapacity cannot or will not be remedied.  Father is essentially asking the Children to wait two more years for him to be able to provide care, which is unacceptable.  As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006); *see also A.H.*, 247 A.3d at 443. ("[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties.").

Having established that the court did not err in terminating Father's parental rights to the Children pursuant to Section 2511(a), we now turn to Section 2511(b). Father asserts that it is not in the Children's best interest to terminate his parental rights. He contends that he was working on his permanency plan goals. He further emphasizes that testimony revealed that N.C. expressed a desire for more contact with Father and that the child loves him. He concludes that the orphans' court failed to analyze the effect termination would have on N.C., and therefore, the court erred.

Father also expresses his concern that if his rights are terminated, the Children will lose all connection to their African American heritage and culture. He further related concerns regarding the difficulties a child encounters growing up without the biological parents. By terminating his rights, Father argues that the court disregarded its duty to "preserve the unity of the family whenever possible" pursuant to 42 Pa.C.S.A. § 6301.

The orphans' court reasoned as follows regarding Section 2511(b):

To begin, Father is incapable of providing basic support for the [C]hildren while incarcerated. He has had sporadic communication with them and has never sent them any gifts, necessities, or money to purchase necessities. The [C]hildren's basic developmental, physical, and emotional needs are met not by Father but solely by the [C]hildren's foster parents.

Moreover, [the C]hildren have heightened needs[.] Father is currently incapable of providing for these heightened needs and does not believe he will be capable of doing so until 2026 at the earliest. Rather, it has been the foster parents who have ensured these heightened needs are met by doing things like transporting the [C]hildren to their appointments and therapies, providing

- 16 -

interaction with the [C]hildren, and feeding T.C. using her G-Tube. Father has shown almost no interest in T.C.'s medical needs.

During this time, [the Children] have bonded with their foster parents and, much to his biological parents' dismay, N.C. calls the foster parents "mom" and "dad." He gets nervous when he has visits with Father and immediately desires to be held by his foster parents afterwards. He has also exhibited signs that having multiple caretakers has had a negative impact on him. Meanwhile, T.C. has never met Father. The only parents T.C. knows are her foster parents. The court believes that any impact termination may have on N.C. is outweighed by the bond he shares with his foster parents. There is no bond between Father and T.C. Ultimately, the court believes that the benefits of permanency with parents who can provide adequate care and control outweighs any emotional detriment that termination may cause.

Orphans' Court Opinion, 6/11/2024, at 14-15. We discern no abuse of discretion.

Initially, we sympathize with Father regarding his concern that the Children may not be as engaged in their heritage and culture since Parents' rights have been terminated. However, Father cites to no law, and we are not aware of any, that requires us to reverse a termination decision by an orphans' court solely based on this purported concern.

Further, the totality of Section 6301(1) provides that the purpose of the section is "to preserve the unity of the family whenever possible or to provide another alternative family when the unity of the family cannot be maintained." 42 Pa.C.S.A. § 6301(1). Here, the orphans' court heard ample evidence to permit it to find that preserving Father's parental rights was not feasible.

As related *supra*, Father has had minimal contact with the Children since they were adjudicated dependent in October 2022, and April 2023,

- 17 -

respectively. *See* N.T., 4/17/2024, at 140-143, 169. Except for one visit early in N.C.'s dependency, each visit has been virtual, and Father often focused the conversation on his disdain that N.C. referred to foster parents as "mom and dad," even telling N.C. that it makes him upset. *Id.* at 161-162, 169. The record does not include any evidence of a "necessary and beneficial" bond between Father and the Children. *See K.T.*, 296 A.3d at 1109.

Contrary to Father's assertion, the orphans' court clearly analyzed the impact termination would have on the Children, stating that any detriment would be outweighed by the benefit of foster parents' permanency, love, and care. *See* Orphans' Court Opinion, 6/11/2024, at 14-15. Ms. Kemrer confirmed that N.C. has expressed that he misses Father and that he loves his biological parents. *See id.* at 40-46. However, she also testified that N.C. loves his foster parents. *See id.* at 46. Although N.C. maintains some affection for Father, his feelings alone are not sufficient to establish that he shares a beneficial bond with Father. *See K.K.R.-S.*, 958 A.2d at 535 ("[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound.").

In contrast, Ms. Kunkel testified as follows regarding the parent-child bond that the Children have with their foster parents:

> It's a very warm relationship. [N.C.] engages with them as I would expect a parent/child relationship to engage. He looks to them for direction, comfort. During my visit he appears very happy, very safe, well nourished. He's usually high energy,

involved in an activity that he wants to show me[. T]hey do a great job of getting the [Children] out into the community and engaging, particularly considering [T.C.'s] really significant needs.

N.T., 4/17/2024, at 65-66. The Children's foster mother also testified with respect to her ability to meet all their significant needs. ***See generally id.*** at 133-143.

Further, as aptly recounted by the orphans' court, the foster mother testified that N.C. is often nervous prior to the virtual visits with Father and seeks her out after the visits to "cuddle." ***Id.*** at 160-161. Finally, as related *supra*, Father was not interested in learning about T.C.'s extensive medical needs. ***See id.*** at 163. Overall, Father has not been able to meet any of the Children's needs while incarcerated, let alone their specific, demanding needs. Instead, it has been the Children's foster parents who have attended to their needs and welfare.

Based on the foregoing, the record evidence amply demonstrates that the termination of Father's parental rights will serve the developmental, physical, and emotional needs and welfare of the Children. Therefore, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to Section 2511(b).

Accordingly, we affirm the decrees terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2024